FILED

**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION**

98 SEP 15 PM 3:46

U.S. DIST. COURT
N.D. OF ALABAMA

LINDA C. GARRETT,                )
                                 )
        Plaintiff,               )
                                 )
vs.                              )        Civil Action No. CV-98-S-88-NE
                                 )
JOE S. HOPPER, et al.,           )
                                 )        **ENTERED**
        Defendants.              )
                                          SEP 1 6 1998

### MEMORANDUM OPINION

Linda Caroline Garrett is a former employee of the Alabama
Department of Corrections. She alleges that she was "falsely
accused ... of having a sexual affair with,"[1] and giving contraband
to a prison inmate. She sues four defendants: the Department of
Corrections; Joe S. Hopper "in his capacity as Commissioner of the
Department of Corrections"; Leoneal Davis "in his individual
capacity" of Warden of the Limestone Correctional Facility; and,
Ralph Hooks "in his individual capacity" of Deputy Warden of that
same prison. Jurisdiction is premised upon "Title VII of the Civil
Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42
U.S.C. § 1983, the Equal Protection provisions and the Due Process
provisions of the ... United States Constitution contained in the
Fourteenth Amendment...."[2] Plaintiff's complaint contains six

---

[1] Complaint originally filed in the United States District Court for the
Middle District of Alabama on July 29, 1997, and transferred to this court
pursuant to 28 U.S.C. § 1404(a) on January 13, 1998, at 2, ¶ 7.

[2] *Id.* at 2, ¶ 5.

Page 1

counts, but her claims actually number five: Title VII and § 1983

claims for a sexually hostile work environment; a Title VII

retaliation claim; and two state law claims for defamation and

invasion of privacy.[3]  The action now is before the court on

defendants' motion for summary judgment.

## I. SUMMARY JUDGMENT STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides

that summary judgment "shall be rendered forthwith if the

pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any, show that there is

no genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law."  "An issue of fact is

'material' if it is a legal element of the claim under the

applicable substantive law which might affect the outcome of the

case."  *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.

1997)(citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248,

106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986)).  "It is 'genuine' if

---

[3] It has been difficult to ascertain exactly what claims plaintiff
attempted to allege.  For example, Count One arguably states either a Title VII
disparate treatment claim, or a Title VII sexually hostile work environment
claim, or both: *i.e.*, "Plaintiff avers that Defendant employer discriminated
against her on the basis of her sex which resulted in harassing treatment because
of her sex, which significantly and negatively affected the terms and conditions
of her employment." (Complaint ¶ 15.)  This court's conclusion that plaintiff
does not state a Title VII disparate treatment claim is based upon two factors.
First is plaintiff's brief in opposition to defendants' motion for summary
judgment (Document No. 19 at (unnumbered pages) 12 *et seq.*), which does not argue
such a claim.  In addition, even if plaintiff attempted to assert a disparate
treatment claim, she fails to support it: she has not alleged, argued in brief,
or submitted evidentiary material indicating that a similarly situated male
employee was treated differently.

Page 2

the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*

The moving party has the initial burden of showing the absence of a genuine issue as to any material fact. *Id.* In determining whether this burden is met, the court must view the evidence "and all factual inferences arising from it in the light most favorable to the nonmoving party." *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)).

Once the movant's initial burden is met, "the burden shifts to the nonmovant to 'come forward with specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). In meeting its burden, "the nonmoving party may avail itself of all facts and justifiable inferences in the record taken as a whole." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992)(citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)).

"The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton*, 965 F.2d at 999 (quoting *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513)(internal quotation marks omitted). Even so, a "mere 'scintilla' of evidence supporting the [nonmoving] party's position will not suffice; there must be enough of a showing that the jury

Page 3

could reasonably find for that party." *Walker v. Darby*, 911 F.2d
1573, 1577 (11th Cir. 1990)(citing *Anderson*, 477 U.S. at 242, 106
S.Ct. 2505). "Where the record taken as a whole could not lead a
rational trier of fact to find for the non-moving party, there is
no genuine issue for trial." *Matsushita*, 475 U.S. at 587, 106
S.Ct. at 1356 (citation omitted).

With those standards in mind, the court now proceeds to
summarize the undisputed facts or, if disputed, to frame them in a
light most favorable to plaintiff.

## II. STATEMENT OF FACTS

Linda Carolyn Garrett began her employment with the Alabama
Department of Corrections on October 30, 1995.[4] She then was known
as Linda C. <u>Adams</u>.[5]  She was provisionally appointed[6] to the
position of "Steward I," working in the kitchen of the Limestone
Correctional Facility located near Capshaw, Alabama.  "Stewards"
principally are responsible for preparing, cooking, and serving
food.  They are assisted in the performance of such duties by some
prison inmates.[7]  This court judicially knows that only male

---

[4] Defendants' Exhibit 1 (plaintiff's provisional appointment form). *See
also* Plaintiff's Deposition at 12.

[5] Defendants' Exhibit 1. Plaintiff married David Randall Garrett on June
1, 1996; prior to that union, she had been known by the following names: Linda
C. <u>Malone</u>, her maiden name; Linda C. <u>Bridges</u>, as a result of a brief, "four
month[]" marriage to Lynn Bridges; and Linda C. <u>Adams</u>, following her marriage to
Marvin Adams. Plaintiff's Deposition at 7-8.

[6] A *provisional appointment* "is approved only until an appropriate eligible
register is established.  A provisional appointment does not confer on the
appointee any status as a permanent employee." Defendants' Exhibit 1.

[7] The job description contained in plaintiff's notification of provisional
appointment (*id.*) reads as follows:

Page 4

convicts are incarcerated in the Limestone Correctional Facility.

Plaintiff was "the only female in the kitchen."[8]

Seven months after her provisional appointment, Linda Garrett was placed in the state merit classification of Steward I, "effective 6/8/96," but she still was required to "complete a probationary period of six months before [she could] attain status under the State Merit System."[9]

> During this probationary period the Commissioner may terminate your employment if you are not performing your job in a satisfactory manner that meets standards; or, your probation may be extended. Of course, it is our hope and expectation that you will successfully complete probation and serve a long and productive career in State service. The results of your final Probationary report will determine if you are to attain permanent status.

(Defendants' Exhibit 2.)

Two significant events occurred about two months later. Plaintiff then was working a night shift, from 10 p.m. until 6 a.m.[10] At the end of her shift on the morning of August 1, 1996, plaintiff was promoted to the position of Steward II.[11] Later that

---

Prepares food according to the Master Menu. Complete documents such as food inventories, equipment inventories, utensil inventories, etc. Assigns and monitors tasks of subordinates stewards and inmates. Monitors kitchen operations. Secures locks, etc. Conducts searches of kitchen. Insepcts [sic] kitchen and dining area. Evaluates performance of inmates. Transports prepared foods and supplies. Participates in committee and board hearings. Serves food in proper portion. Compares information and items. Exchanges information. [Emphasis supplied.]

[8] Plaintiff's Exhibit 10: EEOC charge filed September 3, 1996; see also Plaintiff's Deposition at 98 (lines 1-2).

[9] Defendants' Exhibit 2. On the date of this appointment, plaintiff still was listed on the Alabama Department of Corrections' employment forms as "Ms. Linda C. Adams," even though she had married David Randall Garrett the week before, on June 1, 1996.

[10] Plaintiff's Deposition at 27.

[11] Id. at 31.

Page 5

same morning, however, Assistant Warden Hooks reviewed a letter

addressed to Warden Davis by a Limestone prisoner who did not

identify himself.    The anonymous author asserted that another

inmate, Jimmy Scott, was engaged in a "personal relationship" with

"Miss Adams."[12]

> Mr. Davis
>
> Just a little note to inform you that a inmate by the
> name of Jimmy Scott is currently having a personal
> relationship with Miss Adams. I have heard this inmate
> call her, through a girl named Janice.    In fact, the
> number he [directed] Janice to call was 232-7961[[13]] or
> something close to that. I really could not hear all of
> the numbers very well.    He's also called her at some
> beauty shop.[[14]] I can't figure that one out as of yet.
> I do know that she has been giving him yeast.[[15]]    I
> would bet my parole date that she has some feelings for
> him.  Hell she even goes to his Dad's night club and has
> recently sent him a card.  Something about life is not a
> caberette.  He calls her Linda but I don't know if that's
> her name or just a name they use sexually.
>
> I think that all they done is touched each other and
> kissed.
>
> Scott also has a cousin officer who works here.
>
> I'm sure if you investigate all this you will find out
> everything is true that I say.

(Defendants' Exhibit 3.)

Deputy Warden Hooks directed that inmate Jimmy Scott be

brought to his office for questioning.  Scott initially denied, but

---

[12] See note 5 and related text *supra*.

[13] This had been plaintiff's residential telephone number for "twenty years" as of the date of her deposition, October 28, 1997. Plaintiff's Deposition at 7-8.

[14] Plaintiff owned and operated part-time a Beauty Shop. Plaintiff's Deposition at 28, 35-39.

[15] The significance of yeast lies in the fact that it is used by inmates in combination with sugar and fruit to make an alcoholic brew called "Julep."

eventually admitted to a relationship with plaintiff. The substance of his admissions were reduced to writing:

> I was asked to write this statement by Warden Hooks concerning my relationship with Ms. Adams. I have spoken with her on the phone via 3-way, through a cousin (Janice Harrison-Anniston) on different occasions and have set it up so that she could get free tickets to concerts around Anniston. We were more than just "friendly" with each other because she allowed me to kiss her and has grabbed my butt. I have got yeast 5 or 6 times but never really "alot." I have called her once or twice at "her" beauty saloon. I got two cards from her in the past month. The number at home is 232-7961, I don't know the number at the saloon.[16]

Sergeant Roy Dunaway, one of the correctional officers who escorted Jimmy Scott to Warden Hooks' office, later prepared a formal institutional incident report:

> **15. Narrative Summary:** On August 1, 1996, at approximately 8:15 A.M., Sergeant Roy Dunaway was instructed to escort Inmate Jimmy Scott W/148285 to Warden Ralph Hooks' Officy [sic] by Lieutenant Britt Hendon. Lieutenant Hendon informed Sergeant Dunaway to take all of Inmate Scott's correspondence, such as letters, cards, etc. Sergeant Dunaway went to Dormitory 12, BD3R, the assigned bed of Inmate Scott and found Inmate Scott. Sergeant Dunaway, assisted by Sergeant Bradley Carter, did a shakedown of Inmate Scott's property and confiscated all correspondence.
>
> At approximately 8:30 A.M., Sergeant Dunaway escorted Inmate Scott to Warden Hooks Office. Mr. Hooks and Captain Willie Moore questioned Inmate Scott about his relationship with Linda Adams Garrett, Steward I. Steward Garrett works in the Institutional kitchen where Inmate Scott was assigned to work. Inmate Scott first denied any kind of relationship with Steward Garrett, but after being asked several questions by Warden Hooks, Inmate Scott admitted to a relationship with Steward Garrett. Inmate Scott stated he was from the <u>Gadsden</u>

---

[16] Defendants' Exhibit 3 at (unnumbered page) 7; see also Plaintiff's Exhibit 8 to Warden Ralph Hooks' 1st Deposition.

Page 7

area and had asked Steward Garrett if she had any relatives there because he knew some people by the name of Adams. Inmate Scott stated that one thing had led to another. Inmate Scott stated that Steward Garrett had given him yeast and sugar and that he had kissed her on the cheek a few times and she had felt of his butt a few times. Inmate Scott denied any kind of sexual activity between Steward Garrett and himself.

Captain Moore examined Inmate Scott's personal correspondence and found a card that Inmate Scott said was sent to him by Steward Garrett. Inmate Scott informed Captain Moore that the card was signed with Steward Garrett's nick-name "Nobby".

Inmate Scott informed Warden Hooks that Inmate Scott's father was friends with most of the night club owners in and around Gadsden[17] and had gotten Steward Garrett concert tickets a few times.

Inmate Scott stated that he felt that he would be in danger for giving Warden Hooks information because he was sure Steward Garrett was giving things to other inmates. Inmate Scott stated that these inmates would most likely be mad with him for giving up information that would get Steward Garrett in trouble and cut off their means of getting things from the kitchen.

Warden Hooks concluded the interview with Inmate Scott and Sergeant Dunaway returned him to population.

On August 2, 1996, Warden Hooks ordered Inmate Scott placed in Dormitory #9 under Administrative Segregation until an investigation could be completed. Warden Hooks also met with Steward Garrett on August 2, 1996. When Steward Garrett was confronted about what Inmate Scott had said, she denied having any kind of relationship with any inmate and stated she had never given any inmate any yeast or sugar. Warden Hooks allowed Steward Garrett to continue to work in the kitchen pending an investigation.

Considering the seriousness of the statements made by Inmate Scott about Steward Garrett and her activities, I

---

[17] Note the inconsistency between Inmate Scott's statement, indicating that he had "set it up so that she could get free tickets to concerts around Anniston," and Sergeant Dunaway's references to "Gadsden."

believe that I & I should do a complete investigation of this matter. No other action taken.[18]

Warden Hooks reviewed Jimmy Scott's institutional file and noted that he was caught leaving the kitchen with yeast on July 16, 1996, and that plaintiff was working that same day.[19]  Hooks contacted Scott's sister, Jamie Scott, who admitted she had called plaintiff at home, using three-way calling, to allow plaintiff and Scott to talk with one another.[20]  Hooks also confirmed that the telephone number given by the anonymous author was assigned to plaintiff by the telephone company.

Warden Hooks telephoned plaintiff at her residence during the late afternoon of August 1, 1996, and told her he had information leading him to believe she had engaged in misconduct with inmate Scott.  Plaintiff later described the conversation as follows:

And he said, Ms. Garrett, ... I've had you under investigation for several weeks. And he said, I know that you've been having an affair with an inmate.
. . . .
And then I kind of chuckled and I said, who did you say this was? And he said, this is Ralph Hooks from Limestone Correctional Institution, I think, was the way he worded it. And he said, I'm calling to ask for your resignation. And then he proceeded to tell me that he had evidence — all the evidence that he needed to prosecute me in freewill court and that I was facing three to seven years and that he was giving me an

---

[18]  Plaintiff's Exhibit 4 at (unnumbered pages) 20-21 (emphasis supplied); see also Plaintiff's Exhibit 5 to Warden Hooks' 1st Deposition.

[19]  Plaintiff's Exhibit 9 to Warden Hooks 1st Deposition (i.e., Hooks' response to plaintiff's first EEOC charge) at ¶ 2.

[20]  Id. at ¶ 4.  Note the inconsistency between Warden Hooks' response to plaintiff's first EEOC charge ("Inmate Scott also stated that he had made several three way telephone calls through his sister, Jamie Scott") and Inmate Scott's August 1, 1996 written statement: "I have spoken with her on the phone via 3-way, through a cousin (Janice Harrison-Anniston)...."

Page 9

opportunity to resign. And then I asked him — or I told
him that, no, that I was not going to give a resignation
because I had no reason to give a resignation. Then he
named this inmate, Jimmy Scott. And I said, oh, no, Mr.
Hooks, you're wrong; I just got married; I've only been
married two months. And I also went ahead to tell him
that I had received a promotion at six-thirty that
morning, same morning. And he said he would take care of
that. And as of now, I was on admin[istrative] leave
with pay. And I told him, I said, let me prove to you
that I'm innocent. And he kept insisting that I give him
my resignation, and I said, no. He said to me that I had
let this inmate, Jimmy Scott, caress my breasts and play
with my butt, and that I had sent to him cards signed
Nobby, which was a nickname that the inmate had given to
me because I had given such good blow jobs.
       . . . .
       And that I had been talking to this inmate on three-
way.
       . . . .                                              \
       ... And also that his [inmate Scott's] family was
well off, and they had been taking care of me. His
father had been sending me concert tickets, that I had —
and Mr. Hooks said that I had been attending a lot of
concerts in Gadsden. [21] And I said no, sir, I have not.
And he told me ... how I let this inmate touch my body.
He said, you haven't had intercourse yet. And he said —
he asked me that — if I changed my mind to call him.
       . . . .
       ... And he kept insinuating, I want your
resignation. And he said at one point in time, and I
want it now. And I said, you're not getting it.
       . . . .
       I said, I have no reason to give you my resignation.

(Plaintiff's Deposition at 29-33.)

       Plaintiff returned to work on August 2, 1996, pending an
investigation.[22] She worked "almost" two weeks before beginning an

---

[21] Again, note the inconsistency between this reference to "Gadsden" and
Inmate Scott's August 1, 1996 written statement, indicating that he had "set it
up so that she could get free tickets to concerts around Anniston."

[22] See Plaintiff's Exhibit 9 to Warden Hooks' 1st Deposition (i.e., Hooks'
response to plaintiff's first EEOC charge) at ¶ 7, where he wrote:

       The above circumstances necessitated that I confront her with
       the allegations. I read the allegations from Inmate Scott's

Page 10

extended period of leave from work on the advice of her physician.[23]
Plaintiff suffered from anxiety and depression, which she
attributes to a hostile work environment created by Deputy Warden
Hooks' alleged act of telling several people, who had no need to
know of the investigation, that she was suspected of having an
affair with an inmate.[24] She was subjected to jokes, catcalls, and
ridicule by co-workers and prisoners. (Plaintiff's Deposition at
56-59.) For example, a co-worker remarked, "I seen your boyfriend
today." (*Id.* at 58.) Plaintiff described the last events
preceding her first leave of absence as follows:

> I left work one — the morning before my last day,
> which would have been on the 11[th] of August. And when
> I reached the crossover gate, there was inmates inside
> that said, there goes Nobby. The officer sitting there
> — there was two officers standing there. Nobody said
> anything other than laughed. And they let me through the
> gate. After they let me through the gate, they locked
> the gate, and I just — numerous things.
>
> *Q. But that was the last day you were physically on
> the job until your brief return in September?*
>
> A. No, sir. I worked another night, an hour.
>
> *Q. Anything hostile about that particular shift?*
>
> A. Yes, it was.

---

statement to her by telephone and informed her that if anything was
going on between them that I wanted her resignation. Ms. Garrett
categorically denied the allegations. I informed her that the
investigation would continue. I advised her that she would be on
administrative leave until further notice. Ms. Garrett was placed
on administrative leave for eight hours on August 1, 1996. She was
allowed to return to work on August 2, 1996, pending the
investigation.

[23] Plaintiff's Deposition at 60-61, 63-69.

[24] *See* Plaintiff's Exhibits 8 (affidavit of Shirley Pavonka) and 9
(affidavit of Madge Jarrett).

Page 11

Q. Tell me about it.

A.   I came in to work and — the inmates would
normally be at the door waiting for me when I would come
to work, and the officer would let us all in unless I had
the key to open the back door. And that particular night
there was an inmate that came to me that said that, well,
there was another inmate that Captain Moore had had in
his office all day questioning him about me and said that
I had been bringing him guns, knives, radios, all other
contraband, batteries, just numerous things.

(Plaintiff's Deposition at 115-16.)

Plaintiff asserts that Deputy Warden Hooks' disclosures were

the sole cause of such ridicule, but admits that she also discussed

the allegations against her with many other employees, friends, and

family members. (*Id*. at 53-56, 109-112, 141-143.)

The Investigation & Intelligence Division of the Department of

Corrections initiated a formal investigation on August 21, 1996,

during plaintiff's first leave of absence. While that

investigation was in progress, plaintiff filed, on September 3,

1996, a charge of discrimination with the Equal Employment

Opportunity Commission.

I have been employed with the above named employer since
October 30, 1995. I was hired as a Steward I and was
promoted to Steward II on August 1, 1996. On August 1,
1996, Assistant Warden Ralph Hooks began treating me in
an sexually hostile and offensive manner by accusing me
of having a sexual affair with an inmate and give him
contraband. I was contacted at home and subjected to
sexually explicit and offensive language by Assistant
Warden Hooks when being informed of the alleged sexual
misconduct. I was denied entry to my work area, demoted,
and placed on administrative leave with pay.
Approximately twelve hours later I was allowed to return
to work as a Steward I, however, I will not be allowed to
be reinstated in the position of Steward II until

Page 12

September 28, 1996. I am the only female in the kitchen.
My male co-workers have not been treated in this manner.
The accusations against me were made public and has
created an offensive and embarassing work environment.
I am currently under the the care of a doctor because of
the treatment imposed upon me and I have been forced to
use all of my accrued sick, annual, and holiday pay.

Assistant Warden Hooks give no reason for the treatment
imposed upon me, other than stating what an inmate
alleged to have said.

I believe I have been discriminated against because of my
sex, female, in violation of Title VII of the Civil
Rights Act of 1964, as amended. If I was a male I would
not have been treated in this manner.[25]

Investigator Roy Wood completed the Departmental investigation

on October 9, 1996. He concluded there was "not sufficient

evidence to prove misconduct against Mrs. Linda Adams Garrett."

The following is his synopsis of the report.

On the 21st of August, 1996 this Investigator
received instructions from Assistant Director John
Copeland of the I&I Division to conduct an investigation
concerning the possible misconduct of Steward I, Linda
Adams Garrett.

Warden Hooks received a letter from an Inmate,
(unsigned) that Mrs. Garrett and Inmate Jimmy Scott had
developed a personal relationship. Warden Hooks reported
that when he talked to Inmate Scott concerning these
allegations, Inmate Scott first denied any involvement
with Mrs. Garrett, but later admitted that Mrs. Garrett
had given him yeast on several occasions and he had
kissed her on the cheek on different occasions. Inmate
Scott alleged to Warden Hooks that he had called Mrs.
Garrett's residence on several occasions, by three way
calling and also had received greeting cards from Mrs.
Garrett.

Warden Hooks also reported that he had received
information that a former L.C.F. inmate, Palmer Whidden,

---

[25] Plaintiff's Exhibit 10: EEOC charge filed September 3, 1996.

Page 13

W/M, #150717A had signed a statement that he had received yeast and other contraband items from Mrs. Garrett on several occasions. Inmate Whidden is now assigned to Bullock Correctional Facility.

There was a search conducted of Inmate Jimmy Scott's personal locker by Sergeant Roy Dunaway, and two greeting cards were found in Inmate Scott's locker, with handwritten notes inside the greeting cards and signed by a nickname "Nobby".

After this Investigator reviewed the handwriting on the cards and the handwritings of Mrs. Garrett, it's this Investigator's opinion that the handwritings were not that similar.

This Investigator had Inmate Jimmy Scott and Inmate Palmer Whidden polygraphed by Investigator Ed Sasser of the Montgomery I&I Office. Investigator Sasser stated that Inmate Jimmy Scott was under the care of a Psychiatrist and it was obvious that either Inmate Scott had a nervous condition or was purposely not cooperating and made it impossible for the test to be run. After a Polygraph test was run on Inmate Palmer Widden, concerning Mrs. Garrett giving Inmate Whidden yeast, there were reactions which would indicate deception.

This Investigator tape interviewed Mrs. Linda Adams Garrett on the 5th of September, 1996. Mrs. Garrett denied giving yeast to any inmates and denied having a personal relationship with Inmate Jimmy Scott.

Warden Hooks informed this Investigator on approximately the 25th of September, 1996 that the relatives of Inmate Jimmy Scott informed him that they would send some phone records showing their calling connection with Mrs. Linda Garrett. As of this date, the 8th of October, 1996 this Investigator has not received any phone records concerning Mrs. Garrett's alleged conversations with Inmate Jimmy Scott.

Based on the information and evidence this Investigator has obtained, there is not sufficient evidence to prove misconduct against Mrs. Linda Adams Garrett.[26]

---

[26] Plaintiff's Exhibit 5; see also Plaintiff's Exhibit 10 to Davis Deposition.

Warden Davis thereafter telephoned plaintiff, telling her the investigation had been completed and she could return to work at the promoted grade of Steward II.[27] Plaintiff explained that she was not off work because of the investigation, but due to her medical condition.[28] Plaintiff later visited Warden Davis in his office, asking to be informed of the results of the investigation.

> And that's when he told me, although the investigation is over, ... the incident's not. And I said, then you're not going to tell me about the investigation? He says, no, ma'am, not until you come back to work.[29]

(Plaintiff's Deposition at 73-74.) Based upon the "look in his eyes and the sound of his voice," plaintiff interpreted Warden Davis' statement as a threat. (*Id.* at 75.) "When I looked at him in his eyes, then he says, no, Ms. Garrett, the incident is not over." (*Id.* at 76.) Warden Davis made a similar comment to Shirley Pavonka, who worked in the prison's "central control":

> A month or so later I heard that Mr. Roy Wood had done an investigation of the accusations about Ms. Garrett. I had an occasion to speak with warden Davis about it. I told him I would be glad when all this investigation with Ms. Garrett was over. Warden Davis said that the investigation was over but the incident was not. I asked him what he meant. He said that Ms. Garrett had to be punished for having an affair with an inmate. I reported this to Ms. Garrett. It really upset her.

(Plaintiff's Exhibit 8 at 3.) Plaintiff asserts that, from that date forward, her superiors constantly demanded to know when she

---

[27] Plaintiff's Deposition at 70-72.

[28] *Id.* at 73.

[29] *Id.* at 73-74.

Page 15

intended to return to work.    (Plaintiff's Deposition at 80-91.)

She filed a supplemental EEOC charge on October 29, 1996.

> This charge supplements my original charge # 130962840,
> filed September 3, 1996.
>
> As a result of sexual discrimination and harassment, I
> have suffered medical problems and been placed on medical
> leave by my physician. After I filed my original Charge
> of Discrimination with the EEOC, Warden Davis called me
> at home, and told me the investigation was over and I
> could return to work.  I told him I was under a doctor's
> care and would return as soon as my doctor released me.
>
> Later I went to the prison to pay my health insurance
> premium.  Warden Davis and Personnel Supervisor Kirkland
> kept asking when I would be able to return to work.    I
> told them I was under a doctor's care, but why did it
> matter since the investigation was over.  He said "The
> investigation is over, but the incident is not" in a
> threatening manner.    Warden Davis has informed other
> employees that he has come up with someone to say I was
> fraternizing with prison inmates, which is not true.
>
> I believe I am being discriminated against because of my
> sex, female, and because I filed a Charge of
> Discrimination with the EEOC, in violation of Title VII
> of the Civil Rights Act of 1964, as amended.[30]

Plaintiff's treating physician, Dr. James R. Walker, dictated

a letter to the Department of Corrections on January 27, 1997.  He

related that plaintiff's "major problem is marked anxiety and

depression related to her work place difficulties."   He further

advised "that the level of stress and depression she is currently

exhibiting can lead to suicidal behavior and[,] in this regard, her

condition can be considered life threatening."    (Plaintiff's

Exhibit 19 to Davis Deposition.)

---

[30] Plaintiff's Exhibit 10: Supplemental EEOC charge filed October 29, 1996.

Page 16

At the request of the Department of Corrections, plaintiff underwent an independent, "return to work evaluation" by a "Dr. Gauthier" on March 27, 1997.   That physician concluded that plaintiff suffered "from a mild to moderate depression and moderate anxiety punctuated with what appears to be panic attacks," but expressed a belief that she nevertheless was "able to work at least part time in a job that she perceives to be less stressful, such as a job where she does not come into contact with inmates or is under the direct supervision of Warden Ralph Hooks." (Plaintiff's Exhibit 6 at 2.)

A little over a month later, on May 9, 1997, Deputy Warden Hooks asked Paul Sides, Director of the Investigation and Intelligence Division, to reopen the investigation of plaintiff, saying "I firmly believe that the allegations about Ms. Linda Garrett are true.  I believe than an in-depth investigation will reveal such."  (Plaintiff's Exhibit 4 at (unnumbered page) 24 (emphasis in original).)  Hooks said that, after the completion of the first investigation, several additional inmates had admitted they received contraband from Mrs. Garrett, and he enclosed copies of statements obtained from each.

Roy Wood also supervised the second investigation and, on June 18, 1997, once again concluded that an insufficient basis existed for charging plaintiff with any violation of Departmental policies. (Plaintiff's Exhibit 5 at (unnumbered pages) 8-13.)

Page 17

In early September, 1997, plaintiff briefly returned to work.
She initially was directed to monitor cameras in central control.
Three days later, however, she was reassigned to a position
requiring that she transport inmates to the bus station.    She
suffered a panic attack.    The attack required her to be
hospitalized and, once again, placed under a physician's care.
Plaintiff has not returned to work since that incident.
(Plaintiff's Deposition at 91-97.)   This suit followed.

### III. DISCUSSION

**A.   The Proper Defendants to Plaintiff's Claims**

    **1.   Plaintiff's § 1983 claim**

Section 1983 provides a remedy for violations of federal law
by "persons" acting "under color of" state law.

> Every <u>person</u> who, <u>under color of</u> any statute, ordinance,
> regulation, custom, or usage, of any State or Territory
> or the District of Columbia, subjects, or causes to be
> subjected, any citizen of the United States or other
> person within the jurisdiction thereof to the deprivation
> of any rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity or other
> proper proceeding for redress.   ...

42 U.S.C. § 1983 (emphasis supplied).  As previously noted, Linda
Garrett sued four defendants: the Alabama Department of
Corrections; Joe S. Hopper "in his capacity as Commissioner of the
Department of Corrections"; Leoneal Davis "in his individual
capacity" as Warden of the Limestone Correctional Facility; and,
Ralph Hooks "in his individual capacity" as Deputy Warden of the

Page 18

prison. A determination of whether each is a "person" subject to suit under § 1983 requires separate discussion.

### a.    The Alabama Department of Corrections

The Supreme Court held in *Will v. Michigan Department of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), that states are not "persons" subject to suit under § 1983. The Eleventh Amendment was deemed to have incorporated the common law doctrine of sovereign immunity[31] and thereby bars suits against a state in a federal forum, "unless that State has waived its immunity, ... or unless Congress has exercised its undoubted power under § 5 of the Fourteenth Amendment to override that immunity." *Will,* 491 U.S. at 66, 109 S.Ct. at 2309-10 (citation omitted). The *Will* Court found that the Reconstruction-era Congress that enacted § 1983 "had no intention to disturb the States' Eleventh Amendment immunity and so to alter the federal-state balance in that respect...." *Will*, 491 U.S. at 66, 109 S.Ct. at 2310.[32]

The ruling in *Will* applies not only to the State of Alabama itself, but also to the State's various departments and agencies.

---

[31] The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." By its terms, therefore, the Amendment "bars only federal-court suits against States by citizens of other States." Fitzpatrick v. Bitzer, 427 U.S. 445, 457, 96 S.Ct. 2666, 2672, 49 L.Ed.2d 614 (1975)(Brennan, J., concurring). Even so, as the *Will* opinion demonstrates, the analysis of that Amendment often is mixed with "the nonconstitutional but ancient doctrine of sovereign immunity...." *Id.; see also* Employees v. Missouri Public Health Dept., 411 U.S. 279, 298-324, 93 S.Ct. 1614, 1624-37, 36 L.Ed.2d 251 (1972)(Brennan, J., dissenting).

[32] In contrast, see the discussion of the effect of Congress' 1972 amendments to Title VII of the Civil Rights Act of 1964 *infra*.

Page 19

"Where the defendant is an entity other than the state, the suit
may nonetheless be barred where the state is the 'real party in
interest.'"  *Lassiter v. Alabama A & M University*, 3 F.3d 1482,
1485 (11th Cir. 1993).  Thus, the Alabama Department of Corrections
is not a proper defendant to plaintiff's § 1983 claim.

### b.   Joe S. Hopper

The same conclusion is reached when addressing plaintiff's §
1983 claim against Joe S. Hopper, who is sued "in his capacity as
Commissioner of the Department of Corrections."[33]  State officials
acting in their official capacities are not deemed to be "persons"
subject to suit for money damages under § 1983.

> Obviously, state officials literally are persons.  But a
> suit against a state official in his or her official
> capacity is not a suit against the official but rather is
> a suit against the official's office.  ...  As such, it
> is no different from a suit against the State itself.

*Will*, 491 U.S. at 71, 109 S.Ct. at 2312.  That result flows in part
from the fact that a "judgment against a public servant 'in his
official capacity' imposes liability on the entity that  he
represents," rather that the official individually.  *Brandon v.
Holt*, 469 U.S. 464, 471-72, 105 S.Ct. 873, 877-78, 83 L.Ed.2d 878
(1985); *see also Lassiter*, 3 F.3d at 1485 ("Official capacity
actions are deemed to be against the entity of which the officer is
an agent").[34]

---

[33] When determining the capacity in which a governmental employee is sued,
the court looks "at the complaint and the course of proceedings."  Colvin v.
McDougall, 62 F.3d 1316, 1317 (11th Cir. 1995).

[34] Note, however, that official capacity actions for prospective relief are

Page 20

### c. Leoneal Davis and Ralph Hooks

On the other hand, a § 1983 claim brought against a state official in his individual capacity is permissible. Relief is sought from the individual, not the governmental entity the official represents. See, e.g., Hafer v. Melo, 502 U.S. 21, 25, 112 S.Ct. 358, 362, 116 L.Ed.2d 301 (1991); Colvin v. McDougall, 62 F.3d 1316 (11th Cir. 1995). Accordingly, both Warden Davis and Deputy Warden Hooks, each of whom plaintiff has explicitly sued "in his individual capacity," are "persons" subject to suit for money damages under § 1983. Hafer, 502 U.S. at 31, 112 S.Ct. at 365 ("state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983").

### 2. The proper defendants to plaintiff's Title VII claims

In contrast, The Eleventh Amendment considerations which affect the determination of who may be sued for monetary damages in a claim based upon § 1983 do not pertain to claims founded upon Title VII of the Civil Rights Act of 1964.

---

not treated as actions against the state. Kentucky v. Graham, 473 U.S. 159, 167 n.14, 105 S.Ct. 3099, 3106 n.14, 87 L.Ed.2d 114 (1985); Ex parte Young, 209 U.S. 123, 156, 28 S.Ct. 441, 452, 52 L.Ed. 714 (1908). "The Eleventh Amendment does not insulate official capacity defendants from actions seeking prospective injunctive relief." Lassiter v. Alabama A & M University, 3 F.3d 1482, 1485 (11th Cir. 1993)(citing Wu v. Thomas, 863 F.2d 1543, 1550 (11th Cir. 1989), and Parker v. Williams, 862 F.2d 1471, 1475 (11th Cir. 1989)). See also Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 n.10, 109 S.Ct. 2304, 2312 n.10, 105 L.Ed.2d 45 (1989), holding that "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State'." This is a moot point, however, because plaintiff does not seek prospective injunctive relief herein.

As originally enacted, the Civil Rights Act did not include state and local governments among the definition of "employers" subject to Title VII's prohibitions against workplace discrimination on the basis of "race, color, religion, sex, or national origin."[35]

Congress extensively amended Title VII in 1972, however. Among other things, the revisions:

■    amended the definition of the term "person" to include "governments, governmental agencies, [and] political subdivisions"[36];

■    removed the express exclusion of "a State or political subdivision thereof" from the statutory definition of "employer"[37]; and,

■    included within the definition of "employee" those individuals "subject to the civil service laws of a State government, governmental agency or political subdivision."[38]

Congress invoked § 5 of the Fourteenth Amendment[39] when thus amending the 1964 Civil Rights Act. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 453 n.9, 96 S.Ct. 2666, 2670 n.9, 49 L.Ed.2d 614 (1976)("There is no dispute that in enacting the 1972 Amendments to Title VII to extend coverage to the States as employers, Congress exercised its power under § 5 of the Fourteenth Amendment").

---

[35] The Civil Rights Act of 1964, Public Law 88-352, § 703(a), 78 Stat. 255, 42 U.S.C. § 2000e-2(a).

[36] The Equal Employment Opportunity Act of 1972, Public Law 92-261, § 2(1), 86 Stat. 103, 42 U.S.C. § 2000e(a).

[37] *Id.*, § 2(2), 42 U.S.C. § 2000e(b).

[38] *Id.*, § 2(5), 42 U.S.C. § 2000e(f).

[39] Section 5 provides that "The Congress shall have power to enforce, by appropriate legislation, the provisions of this article."

Page 22

As a consequence, the 1972 Amendments constitutionally
abrogated the states' sovereign immunity from suit under the
Eleventh Amendment.

> [T]he Eleventh Amendment, and the principle of state
> sovereignty which it embodies, ... are necessarily
> limited by the enforcement provisions of § 5 of the
> Fourteenth Amendment.   In that section Congress is
> expressly granted authority to enforce "by appropriate
> legislation" the substantive provisions of the Fourteenth
> Amendment,  which  themselves  embody  significant
> limitations on state authority.   When Congress acts
> pursuant to § 5, not only is it exercising legislative
> authority that is plenary within the terms of the
> constitutional grant, it is exercising that authority
> under one section of a constitutional Amendment whose
> other sections by their own terms embody limitations on
> state authority.   We think that Congress may,  in
> determining what is "appropriate legislation" for the
> purpose of enforcing the provisions of the Fourteenth
> Amendment, provide for private suits against State or
> state officials which are constitutionally impermissible
> in other contexts.   ...

*Fitzpatrick*, 427 U.S. at 456, 96 S.Ct. at 2671 (citations omitted).

It follows, therefore, that plaintiff may constitutionally
bring suit under Title VII against her "employer," the State of
Alabama's Department of Corrections. It does not follow, however,
that the individual defendants are proper respondents to her Title
VII claims. Rather, the opposite is true.

> Individual capacity suits under Title VII are ...
> inappropriate.  The relief granted under Title VII is
> against the employer, not individual employees whose
> actions would constitute a violation of the Act.  We
> think the proper method for a plaintiff to recover under
> Title VII is by suing the employer, either by naming the
> supervisory employees as agents of the employer or by
> naming the employer directly.

Page 23

*Busby v. City of Orlando*, 931 F.2d 764, 772 (11th Cir. 1991)(citations omitted)(emphasis in original); *accord, e.g., Cross v. State of Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995); *Smith v. Lomax*, 45 F.3d 402, 403 n.4 (11th Cir. 1995).

In summary, therefore, Leoneal Davis and Ralph Hooks, sued in their individual capacities, are the only defendants to plaintiff's § 1983 claim, and the Alabama Department of Corrections is the only proper defendant to her Title VII claims.

**B.    The Elements of Plaintiff's Title VII and § 1983 Claims**

**1.    Title VII sexually hostile work environment**

Title VII makes it "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's ... sex...." 42 U.S.C. § 2000e-2(a)(1). The Eleventh Circuit has observed that "Title VII prohibits employment discrimination on the basis of gender, and seeks to remove arbitrary barriers to sexual equality at the workplace with respect to 'compensation, terms, conditions, or privileges of employment.'" *Henson v. City of Dundee*, 682 F.2d 897, 901 (11th Cir. 1982). In *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986), the Supreme Court held that "unwelcome sexual advances that create an offensive or hostile working environment violate Title VII. Without question, when a supervisor sexually harasses a subordinate because

Page 24

of the subordinate's sex, that supervisor 'discriminate[s]' on the basis of sex." *Id.* at 64, 106 S.Ct. at 2404.[40]

"Courts recognize two forms of sexual harassment: *quid pro quo* sexual harassment and hostile work environment sexual harassment. ... Hostile [work] environment sexual harassment occurs when an employer's conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive environment." *Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir. 1989)(citations and internal quotation remarks omitted).

The Supreme Court instructs that Title VII is violated, and sexual harassment is actionable, whenever the workplace is permeated with "discriminatory intimidation, ridicule, and insult" (*Meritor Savings Bank*, 477 U.S. at 65, 106 S.Ct. at 2405) that is "sufficiently severe or pervasive 'to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee*, 682 F.2d 897, 904 (11th Cir. 1982)).

There are five elements of a *prima facie* Title VII case of hostile work environment sexual harassment: (1) the employee must

---

[40] The Court in *Meritor Savings Bank* rejected the employer's contention that "Congress was concerned with ... 'tangible loss' of 'an economic character,' not 'purely psychological aspects of the workplace environment"; instead, the Court emphasized that "the language of Title VII is not limited to 'economic' or 'tangible' discrimination.  The phrase 'terms, conditions, or privileges' of employment' evinces a congressional intent 'to strike at the entire spectrum of disparate treatment of men and women' in employment."  477 U.S. at 64, 106 S.Ct. at 2404 (citation omitted)(internal quotation marks omitted).

Page 25

belong to a protected group[41]; (2) the employee must establish that she was subjected to unwelcome sexual harassment[42]; (3) the harassment complained of must have been based upon the employee's gender[43]; (4) the harassment complained of must have affected a term, condition, or privilege of the plaintiff's employment, in that it was sufficiently severe or pervasive as to alter the conditions of employment and created an abusive working environment; and (5) the employer either knew, or should have known of the harassment, but failed to take prompt remedial action and, therefore, is vicariously liable under traditional agency principles of *respondeat superior*.[44] *See Cross v. State of Alabama*, 49 F.3d 1490, 1504 (11th Cir. 1995)(citing *Henson v. City of Dundee*, 682 F.2d 897, 903-04 (11th Cir. 1982)).

---

[41] Title VII's prohibitions against gender-based employment discrimination apply equally to men and women.

[42] *See, e.g.*, Henson v. City of Dundee, 682 F.2d 897, 903 (11th Cir. 1982)(citations omitted), where the court defines the phrase, "unwelcome sexual harassment," as follows:

The E.E.O.C. regulations helpfully define the type of conduct that may constitute sexual harassment: "sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature...." 29 C.F.R. § 1604.11(a) (1981). ... In order to constitute harassment, this conduct must be unwelcome in the sense that the employee did not solicit it or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive.
...

[43] "In proving a claim for a hostile work environment due to sexual harassment, ... the plaintiff must show that but for the fact of [his or] her sex, [he or] she would not have been the object of harassment. ..." *Henson*, 682 F.2d at 904 (citations omitted).

[44] *Id.* at 903-905.

Page 26

## 2.  § 1983 sexually hostile work environment

Plaintiff also alleges a violation of her equal protection rights under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983, based upon the same hostile work environment.[45]  Public employees "have a constitutional right to be free from unlawful sex discrimination and sexual harassment in public employment." *Cross v. State of Alabama*, 49 F.3d 1490, 1507 (11th Cir. 1995)(citing *Davis v. Passman*, 442 U.S. 228, 235, 99 S.Ct. 2264, 2271, 60 L.Ed.2d 846 (1979)).

Whenever an equal protection claim under § 1983 is used as a parallel remedy for conduct that also could be a violation of Title VII, the elements of a *prima facie* case are the same as those discussed above.  *Whiting v. Jackson State University*, 616 F.2d 116, 121 (5th Cir. 1980)[46]; *see also Cross*, 49 F.3d at 1507-08 (citing, *e.g., Hardin v. Stynchcomb*, 691 F.2d 1364, 1369 n.16 (11th Cir. 1982)).  In addition to those five requisites of a Title VII claim, however, a plaintiff must establish three more elements: (6) that the harassment complained of was committed by a "person" subject to liability under § 1983; (7) that the person acted "under color of" state law; and (8) the defendant acted with discriminatory purpose or intent.  *See Watkins v. Bowden*, 105 F.3d 1344,

---

[45] Despite plaintiff's reference to the due process clause of the Fourteenth Amendment in her complaint, this court does not understand her to complain that she was denied procedural due process.

[46] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

Page 27

1355 (11th Cir. 1997)(citing *Cross*, 49 F.3d at 1504, 1507-08); *see also* Barbara Lindemann & David D. Kadue, *Sexual Harassment in Employment Law* 294 (1992).

## C. Application of Law to Facts

Defendants do not dispute the first, sixth, and seventh elements of plaintiff's *prima facie* Title VII/§ 1983 hostile work environment claims: *i.e.*, plaintiff is female and, therefore, a member of a protected class; and, defendants Davis and Hooks, when sued in their individual capacities, are "persons" who acted "under color of" state law. Defendants attack plaintiff's proof on all other elements, however. Nevertheless, only a few need be addressed here.

### 1. Unwelcome sexual harassment

In order for conduct to constitute actionable harassment, it must be more than just "unwelcome in the sense that the employee did not solicit or incite it, and in the sense that the employee regarded the conduct as undesirable or offensive." *Henson*, 682 F.2d at 903. Rather, and more fundamentally, the conduct also must be sex-based, of a sexual nature.

The fact patterns of the numerous cases in this area can be collapsed into three categories of conduct: sexual advances; gender-based acts of animosity (*i.e.*, gender-baiting, teasing, hazing, and sabotage of work performance); or sexually-charged workplaces full of crude, vulgar, foul, sexually offensive

Page 28

language, innuendo, or visual displays.   *See generally* Barbara

Lindemann & David D. Kadue, *Sexual Harassment in Employment Law*

170-71 (1992)(collecting cases).

The conduct of which plaintiff complains in this case arguably

fits only one of those categories: the second.

> In one common situation, women employees, often in
> occupations or workplaces traditionally dominated by men,
> are subjected to hazing behaviors: scorn, ridicule, and
> verbal abuse from males who resent their presence.   The
> behavior consists of gestures, words, or conduct that may
> or may not be sexual in content.

Lindemann & Kadue, *supra* at 30.   Elsewhere, the same authors note

that:

> Behavior motivated by gender-based animosity usually
> takes one of two forms: (1) hostile conduct of a sexual
> nature (gender baiting), or (2) nonsexual hazing based on
> gender.   The conduct complained of can be clearly sexual
> in nature, clearly nonsexual in nature, or, as is more
> common, both sexual and nonsexual in nature.   The
> harasser can be a supervisor, a co-worker, or both.

> *1.   Gender Baiting*

> Other than unwelcome sexual advances, gender baiting
> is the easiest form of behavior to recognize as sex-based
> conduct, for the behavior aims to make life unpleasant
> for women employees because they are women.   Gender
> baiting can take the form of speech or action.   Words
> directed specifically at women may "deriv[e] their power
> to wound not only from their meaning but also from 'the
> disgust and violence they express phonetically.'" ...

> • • • •

> *2.   Nonsexual Hazing Based on Sex*

> Hazing consists of offensive conduct, usually not
> overtly sexual in nature, that is visited upon a
> complainant because of gender.   Acts of physical
> aggression, threats of physical violence, and arguably

Page 29

> ambiguous conduct, such as urinating in a female co-
> worker's gas tank, though not inherently sexual in
> nature, can nonetheless constitute harassment on the
> basis of sex.   The purpose of this behavior, as in
> explicit gender-baiting cases, is to harrass, intimidate,
> and make life unpleasant for the complainant.  ...

*Id.* at 75, 82 (footnotes omitted).

Without question, the teasing and hazing to which plaintiff was subjected — comments such as *"I seen your boyfriend today,"* or *"there goes Nobby"* — would be unwelcome to a reasonable person, especially one falsely accused of having engaged in a sexual relationship with a prison inmate. The crucial issue, however, is whether such teasing was sufficiently severe or pervasive as to be actionable.

### 3.   Severe and pervasive

The Supreme Court emphasized in *Meritor Savings Bank* that "not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII. ... For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment." 477 U.S. at 67, 106 S.Ct. at 2405.

The "mere utterance" of sexually explicit epithets and derogatory statements "which engender offensive feelings in an employee" is not actionable. *Meritor Savings Bank*, 477 U.S. at 67, 106 S.Ct. at 2405 (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th

Page 30

Cir. 1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d
343 (1972)). "Title VII does not attempt 'to purge the workplace
of vulgarity,'"[47] nor did Congress "expect employers to purify the
language in the workplace or remove all vulgarity or coarse
comments."[48] Conduct which was "construed ... as mere locker room
antics, joking, or horseplay" also has been held beyond the purview
of Title VII.[49]

Speaking for a unanimous court in *Harris v. Forklift Systems,*
Justice O'Connor said the issue of

> whether an environment is "hostile" or "abusive" can be
> determined only by looking at all the circumstances.
> These may include the frequency of the discriminatory
> conduct; its severity; whether it is physically
> threatening or humiliating, or a mere offensive
> utterance; and whether it unreasonably interferes with an
> employee's work performance. The effect on the
> employee's psychological well-being is, of course,
> relevant to determining whether the plaintiff actually
> found the environment abusive. But while psychological
> harm, like any other relevant factor, may be taken into
> account, no single factor is required.

*Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 23, 114 S.Ct. 367,
371, 126 L.Ed.2d 295 (1993).

*Harris* reaffirmed *Meritor's* holding that sexual harassment
must either be severe or pervasive in order to be actionable, but
stressed that such factors must be measured by an "objective

---

[47] Hopkins v. Baltimore Gas and Electric Co., 77 F.3d 745, 753 (4th Cir.
1996)(*quoting* Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir.
1995)).

[48] Johnson v. Hondo, Inc. 940 F. Supp. 1403, 1410 (E.D. Wis. 1996).

[49] Tietgen v. Brown's Westminster Motors, Inc., 921 F. Supp. 1495, 1501
(E.D. Va. 1996).

Page 31

standard": *i.e.,* that which a reasonable person would find hostile

or abusive.

> As we pointed out in *Meritor,* "mere utterance of an
> epithet which engenders offensive feelings in an
> employee" ... does not sufficiently affect the conditions
> of employment to implicate Title VII. Conduct that is
> not severe or pervasive enough to create an objectively
> hostile or abusive work environment—an environment that
> a reasonable person would find hostile or abusive—is
> beyond Title VII's purview. Likewise, if the victim does
> not subjectively perceive the environment to be abusive,
> the conduct has not actually altered the conditions of
> the victim's employment, and there is no Title VII
> violation.

*Harris,* 510 U.S. at 21-22, 114 S.Ct. at 370-71. In a concurring

opinion, Justice Scalia emphasized that "[t]oday's opinion

elaborates that the challenged conduct must be severe or pervasive

enough 'to create an objectively hostile or abusive work

environment—an environment that a reasonable person would find

hostile or abusive.'" *Id.* at 24, 114 S.Ct. at 373 (Scalia, J.,

concurring).

Defendants correctly characterize the conduct and statements

of which plaintiff complains as isolated, individual occurrences.

Plaintiff's only confrontation with Deputy Warden Hooks occurred

during the August 1, 1996, telephone conversation. While plaintiff

found his statements offensive,[50] it is clear that Warden Hooks did

not use obscene or inappropriate words; rather, he only related the

substance what he had been told by the author of the anonymous

---

[50] *See* Plaintiff's Deposition at 41 ("When he said to me how I had let this
inmate touch my body parts").

Page 32

letter and inmate Scott. The most likely basis for plaintiff's subjective reaction to Warden Hooks' statements was the fact that the man to whom she had been married only two months "was [listening] on the other phone." (Plaintiff's Deposition at 39.) Plaintiff's allegations against Warden Davis are based solely on his statement that "the investigation may be over, but the incident is not."[51] The "I seen your boyfriend" comment is attributed to an unidentified co-worker; and, the "there goes Nobby" taunt was uttered by an unidentified inmate. Plaintiff does not present evidence of any other offensive comments.

After carefully considering the totality of circumstances related by plaintiff, this court finds that no reasonable jury could conclude that such isolated events were either "severe" or "pervasive" when viewed through the lens of an objective standard: *i.e.*, "an environment that a reasonable person would find hostile or abusive." *Harris*, 510 U.S. at 24, 114 S.Ct. at 373 (Scalia, J., concurring). Indeed, the Supreme Court recently emphasized that "simple teasing, ... off hand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, __ U.S. __, 118 S.Ct. 2275, 2283 (1998)(citation and internal quotation marks omitted). *See also*

---

[51] Notwithstanding the threat plaintiff perceived as implicit in that comment, it is undisputed that Warden Davis never took any disciplinary action against plaintiff.

Page 33

*Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1189 (2d Cir. 1987),
*overruled on other grounds by Patterson v. McLean Credit Union*, 491
U.S. 164, 109 S.Ct. 2362, 105 L.Ed.2d 132 (1989)(to be deemed
pervasive, the conduct must be more than episodic; it must be
sufficiently continuous and concerted); *Katz v. Dole*, 709 F.2d 251,
256 (4th Cir. 1983)(isolated incidents generally will not be
sufficient to create a hostile working environment); *Baskerville v.
Culligan International Co.*, 50 F.3d 428, 430 (7th Cir. 1995)("[a]
handful of comments spread over months is unlikely to have so great
an emotional impact as a concentrated or incessant barrage"); *Weiss
v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir.
1993)(relatively isolated incidences of non-severe conduct do not
rise to the level of a hostile environment); *Christoforou v. Ryder
Truck Rental*, 668 F. Supp. 294, 301 (S.D. N.Y. 1987)(although the
level of behavior needed to create a hostile environment "cannot be
precisely defined," it is "clearly more abusive, pervasive and
persistent" than three specific incidents of sexual harassment over
an 18 month period).

Thus, this court determines that plaintiff's Title VII and §
1983 sexually hostile work environment claims fail.

**D. Plaintiff's Title VII Retaliation Claim**

To establish a *prima facie* case of retaliation under Title
VII, an employee must show (1) statutorily protected expression,
(2) an adverse employment action, and (3) a causal link between the

Page 34

protected expression and the adverse action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir. 1993). Defendants focus on the second element, arguing that plaintiff suffered no adverse employment action.

In response, plaintiff first asserts that her supervisors' frequent requests that she tell them the specific date she intended to return to work constituted an adverse employment action. That contention is without merit. It was entirely reasonable for plaintiff's employer to ask when, if ever, she intended to return to work.

Plaintiff next argues her reassignment to a position requiring that she drive inmates to the bus station constitutes retaliation. That contention has more merit, especially when it is juxtaposed to the following facts.

First, Deputy Warden Hooks fervently pursued a second investigation of plaintiff. He submitted the names and telephone numbers of several additional witnesses and written statements from five inmates.[52] Moreover, all inmates from whom Warden Hooks obtained written statements were subjected to polygraph examination, but only one (Lavone Shaver) tested as credible, and that after his first examination was deemed "inconclusive." Of the others who indicated "deception," one is worthy of particular note.

---

[52] See Plaintiffs Exhibit 4 at (unnumbered pages) 22-24.

Page 35

On the 13th of December Warden Hooks advised this Investigator that Inmate Jeffrey Willingham had alleged that he received contraband from Mrs. Garrett. (See attached statement)

Investigator [Hillman] Bailey polygraphed Inmate Jeffrey Willingham on the 17th of December 1996. Inmate Willingham alleged that Mrs. Garrett brough radios and headsets to the prison for Inmate Willingham. Investigator Bailey stated at the conclusion of the testing procedure of Inmate Willingham [that] deception was indicated. (See attached Polygraph Examination)

Investigator Bailey reported that Inmate Willingham was given an opportunity to explain these reactions. <u>Inmate Willingham stated he was under much pressure from the Administration at the institution to take the polygraph.</u> Inmate Willingham informed Investigator Bailey that he knew if he did not take the examination that he would not get out of prison until the year 2001. The investigation was closed.

(Plaintiff's Exhibit 5 at (unnumbered pages 9-10)(emphasis supplied).)

Third, Warden Davis told Shirley Pavonka "that Ms. Garrett had to be punished for having an affair with an inmate." (Plaintiff's Exhibit 8 at 3: *see also* page 15 *supra*.)

Fourth, the physician selected by the Department of Corrections to evaluate plaintiff's fitness to return to work cautioned that she be placed in "a job where she does not come into contact with inmates...." (Plaintiff's Exhibit 6 at 2; *see also id.* at 4, where Dr. Gauthier records: "Ms Garrett did tell me she is quite willing to work, though she was quite hesitant to return where she would have contact with inmates.")

Page 36

Finally, this court notes the affidavit of Madge Jarrett, who was employed by the Department of Corrections as a psychologist at Limestone Correctional Facility for "almost 12 years." (Plaintiff's Exhibit 9 at 1.) She relates that "[i]n my own experience with Mr. Hooks he has made remarks to the effect that women should not work at the prison. On one occasion he told me that instead of doing my job I should stay home with my child like his wife. I found this offensive." (*Id.* at 4.)

Based upon the totality of the foregoing circumstances, this court finds that a reasonable fact finder could conclude that plaintiff's reassignment to a position which placed her in close, unsecured contact with prison inmates (driving them in a van to the bus station) is explicable only as an effort to punish her and/or persuade her to quit her job, in retaliation for her two EEOC charges. As to this claim, therefore, defendants' motion for summary judgment is due to be denied.

**E.  Defamation**

There are basically four elements of a defamation claim under Alabama law: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication of that statement to a third party; (3) fault amounting at least to negligence on the part of the defendant; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication of the statement." *McCaig v.*

Page 37

*Talladega Publishing Company, Inc.*, 544 So. 2d 875, 877 (Ala. 1989); *see also Atkins Ford Sales, Inc. v. Royster*, 560 So. 2d 197, 200 (Ala. 1990)(plaintiff "must show that the defendant published a false and defamatory statement concerning the plaintiff to a third person").

The pivotal element is the second: "There must be publication of the words to some third party to be actionable. In the absence of publication, mere foul, abusive, insulting, and contemptuous language is not sufficient alone to state a cause of action...." Charles W. Gamble, *Alabama Law of Damages* § 36-26, at 484 (3d ed. 1994).

Plaintiff argues defendants circulated defamatory rumors to the effect that she had engaged in an "affair" with an inmate, and, that she had brought contraband into the prison. However, the Alabama Supreme Court held in *K-Mart Corporation, Inc. v. Pendergrass*, 494 So. 2d 600, 604 (Ala. 1986), that "[p]ublication is not 'established by rumor or report.'" In *Pendergrass*, the plaintiff relied on the inference that someone at K-Mart must have communicated with someone outside the store, because the surrounding community was aware of the reasons for her dismissal. The *Pendergrass* court did not accept that inference to establish publication, and neither does this court — particularly in view of plaintiff's failure to eliminate herself as the source of the rumors which precipitated the hazing. Indeed, plaintiff admits

Page 38

talking about the allegations that had been made against her with
numerous persons within and outside the confines of the prison.

Nevertheless, Deputy Warden Hooks clearly uttered slanderous
statements to prison psychologist Madge Jarrett, who relates that:

> Around the first of August of 1996 assistant warden
> Hooks asked me to certify that inmate Jimmy Scott was
> psycholog[ically] sound. I told him that I could not....
> I had done quite a bit of work with inmate Scott and I
> made it plain to Mr. Hooks that inmate Scott was mentally
> very unstable.
>
> Later that same day I was standing in the
> administration building in front of the warden's office
> when Mr. Hooks said that Ms. Linda Garrett had "fucked"
> that inmate and he had four convicts who would testify to
> it. There were other people around when this statement
> was made. I was offended by Mr. Hook's remark. I was
> not in a "need to know" position. His remark was crude,
> unprofessional and uncalled for. His demeanor made it
> clear it was said for shock value. It was inappropriate
> since others who did not need to know were within hearing
> of this.

(Plaintiff's Exhibit 9 at 2.) Alabama statutory and decisional law
both confirm that words falsely imputing a want of chastity to a
woman are slander *per se*. Alabama Code § 6-5-181 (1975); Gamble,
*supra* § 36-27, at 486 n.6 (collecting cases).

The Alabama Supreme Court's decision in the *Atkins Ford Sales*
case, *supra*, to the effect that "communications among employees in
the course of transacting a company's business and in the proper
scope of an employee's duties do not constitute a publication," 560
So. 2d at 201, does not save defendant Hooks or his employer from
the consequences of his vile statement. As Ms. Jarrett points out,
plaintiff did not consult her for counseling until some days later;

Page 39

and, when she did, Warden Hooks initially took the position "that I was forbidden from seeing her." Thus, on the day that Warden Hooks made his offensive assertion to psychologist Jarrett, she "was not in a 'need to know' position."[53]

As to this claim, therefore, defendants' motion for summary judgment also is due to be denied.

## F. Invasion of Privacy

Plaintiff's final claim is for invasion of privacy. To prevail, plaintiff must show "the wrongful intrusion into one's private activities [was such] as to outrage or cause mental suffering, shame, or humiliation to a person of ordinary sensibilities." *Wright v. Wright*, 654 So. 2d 542 (Ala. 1995)(citing *Phillips v. Smalley Maintenance Services, Inc.*, 435 So. 2d 705 (Ala. 1983)). "The 'wrongful intrusion' prong of the tort of invasion of privacy has been defined as the 'intentional interference with another's interest in solitude or seclusion, either as to his person or to his private affairs or concerns.'" *Hogin v. Cottingham*, 533 So. 2d 525, 531 (Ala. 1988)(quoting W. Prosser & W. Keeton, *The Law of Torts*, 851 (5th Ed. 1984)). The Alabama Supreme Court holds that "the thing into which there is

_____

[53] In contrast, Warden Davis' statement to Shirley Pavonka "that Ms. Garrett had to be punished for having an affair with an inmate" arguably is protected from liability for slander by Atkins Ford Sales, Inc. v. Royster, 560 So. 2d 197, 201 (Ala. 1990), because Ms. Pavonka worked in the prison's central control facility and, thus, had need to know of the status of employees coming and going through the institution's security gates.

Page 40

intrusion or prying must be, and be entitled to be, private."
*Hogin*, 533 So. 2d at 531; Prosser & Keeton, *supra*, at 855.

Defendants argue all actions pertaining to the investigation
of plaintiff were related to her employment and not her private
seclusion. This court agrees. Defendants' questions to plaintiff
about her relations with inmate Scott were not a matter entitled to
privacy, but rather a matter which implicated a possible violation
of the Department of Correction's Employee Standards of Conduct.
(Defendants' Exhibit 4 at 3.)

Nevertheless, plaintiff argues defendants conducted the
investigation in an offensive and improper manner, which would
state a claim for invasion of privacy. Plaintiff's argument fails.
She offers no evidence the investigation was conducted in an
abusive, improper, or offensive way. Plaintiff only makes a
conclusory allegation. Defendants inquired into sexual matters
with the plaintiff, yes, but only because that was a component of
the allegations which had been made. Defendants had a right to
confront plaintiff with the evidence against her. Once plaintiff
commenced her medical leave, defendants simply inquired when she
intended to return to work. Defendants were holding plaintiff's
position open, pending her medical leave, and consequently had a
right to know when, if ever, she intended to resume her duties.

Accordingly, as to this claim, defendants' motion for summary
judgment is due to be granted.

Page 41

## III. CONCLUSION

For the foregoing reasons, this court concludes that defendants' motion for summary judgment is due to be granted in part and denied in part. An appropriate order consistent with this memorandum opinion will be issued contemporaneously herewith.

DONE this _16th_ day of September, 1998.

United States District Judge

Page 42